IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROSEVELT BELL, | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 06-161 Erie |
| v. | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security,[1] | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

Plaintiff, Rosevelt Bell, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security, who found that he was not entitled to supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  Bell filed an application for SSI on November 18, 2002, alleging disability since December 26, 2001 due to back problems and pelvis pain (Administrative Record, hereinafter "AR", at 92-94; 135).  His application was denied initially, and Bell requested a hearing before an administrative law judge ("ALJ") (AR 51-54; 59).  A hearing was held on December 5, 2003, and on December 20, 2003, the ALJ found that Bell was not disabled at any time through the date of his decision, and therefore was not eligible for SSI benefits (AR 38-45; 343-368).

Bell requested review of the ALJ's decision by the Appeals Council, who noted that Bell had filed a subsequent application for SSI and was found disabled on April 23, 2004 by virtue of meeting Listing 12.05B (AR 47-50).  On June 14, 2005, the Appeals Council consolidated the two claims, vacated the ALJ's December 2003 decision, reopened the favorable April 2004 state agency decision and remanded the case for further consideration (AR 46-50).  The Appeals Council determined that with respect to the December 2003 decision, further consideration

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Fed.R.Civ.P. 25(d)(1) and 42 U.S.C. 405(g), he is automatically substituted as the defendant in this case.

should be given to Bell's intellectual functioning and illiteracy, and that his capacity to perform work at the medium level required further assessment (AR 47-48).  With respect to the April 2004 decision, the Appeals Council found that the state agency examiner did not address the critical element of Listing 12.05 with respect to deficits in adaptive functioning manifested during the developmental period (AR 48-49).

Following remand, the ALJ held a second hearing on March 9, 2006, and subsequently issued a second unfavorable decision on April 21, 2006 (AR 16-25; 369-407).  Bell's request for review by the Appeals Council was denied (AR 7-9), rendering the Commissioner's decision final under 42 U.S.C. § 405(g).  The instant action challenges the ALJ's decision.  Presently pending before the Court are cross-motions for summary judgment.  For the reasons set forth below, we will deny both motions.

## I. Background

Bell was fifty-two years old on the date of the ALJ's decision (AR 23).  He has an eighth grade education and was in special education classes, and past relevant work experience as a laborer (AR 136; 376).

Bell was evaluated by Bharathi S. Voora, M.D., on February 4, 2002 pursuant to the request of the Commissioner (AR 214-217).  Bell reported that he had recently been released from jail in October 2001 following a conviction for indecent assault and was living in a halfway house (AR 214).  Following his release from jail he stated that he was unable to find work due to the poor economy (AR 214).  He reported he was applying for disability because he was laid off from work and had back pain since an auto accident in 1970 (AR 214).  He complained of dull pain in his lower back without radiation (AR 214).  Bell reported that he was not on any medication and was able to do his "routine work" without any problems (AR 214).  Bell stated that he became depressed because he was not able to read or write well and did not think he could maintain a job (AR 215).  However, Dr. Voora noted that he did not appear depressed and had never been treated for depression (AR 216).

Dr. Voora's physical examination of Bell was essentially normal and she noted that he was able to walk without any problems (AR 214; 216).  X-rays of his lumbar spine showed only minor degenerative changes (AR 241).  Dr. Voora assessed him with occasional low back pain

without any radicular symptoms, and noted that due to his complaints of depression, he would probably benefit from a mild antidepressant (AR 217). She rated Bell's overall prognosis as "good," and opined that he was able to frequently lift and carry up to 25 pounds and had no other limitations (AR 217-219).

On October 28, 2002, Bell sought treatment at Community Health Net for complaints of low back pain radiating into his thighs anteriorly and left inguinal bulging (AR 234). On physical examination, Luiz Galvao, M.D., reported that there was a left inguinal bulging, straight leg raising test was negative, manipulation of his hips was negative, deep tendon reflexes were normal and symmetrical and palpation of his spine was unremarkable (AR 234). Dr. Galvao diagnosed mid low back pain and an inguinal hernia (AR 234). He prescribed Naprosyn and Zantac for Bell's back pain and referred him to a surgeon for his hernia (AR 234).

Bell returned to Dr. Galvao on November 27, 2002 and reported that medication had completely resolved his back pain (AR 231). He had no other complaints and his physical examination was normal (AR 231).

On February 7, 2003, Bell underwent laparoscopic surgery to repair his left inguinal hernia (AR 266-276).

On July 24, 2003, Bell was referred to physical therapy for his complaints of back pain (AR 329). When he returned to Community Health Net on July 28, 2003, his straight leg raising test was negative (AR 329). He was to continue physical therapy and the Naprosyn (AR 329).

Pursuant to the request of the Commissioner, Bell underwent intelligence testing performed by Lamar Neal, Psy.D., on August 26, 2003 (AR 277-286). Dr. Neal reported that Bell's grooming and hygiene were fair and his clothes were mildly dirty (AR 277). Bell utilized the bus to attend his appointment and reported that he did not possess a driver's license since he had never been able to pass the test (AR 277). He indicated that he completed school through the eighth grade but was always in special education classes (AR 277). His most recent job was as a laborer in 1996 (AR 277). Bell reported that he was taking Ativan for depression and Naproxen for back pain, but denied any psychiatric history or any other significant medical problems (AR 278). He claimed he lived "on the street," reported to community shelters for assistance, had never had a bank account and was able to sustain himself on food stamps and cash assistance

which he managed himself (AR 278).  Dr. Neal noted that he reported some activity of daily living skills; he was able to cook, do laundry and ride the bus, but required assistance from bus drivers or others to read his paperwork as to the location of his appointments (AR 278).

Dr. Neal administered the Wechsler Adult Intelligence Scale Third Edition (WAIS-III) (AR 104-105).  Bell achieved a Verbal IQ of 66, a Performance IQ of 59, and a Full Scale IQ of 61, which Dr. Neal found would place his intellectual functioning within the mild range of mental retardation (AR 278).  He noted that Bell was pleasant and appeared to be an accurate historian, and indicated that the "results [were] felt to be valid" (AR 278).  However, he felt that Bell's Full Scale IQ was a mild underestimate of his true abilities (AR 278).  He noted that Bell had extreme difficulty in articulating any answers, which often resulted in errors when he appeared to have some understanding of terms and instructions (AR 278).  Dr. Neal estimated that his true functioning was "possibly" in the upper end of mild mental retardation or even the lower end of borderline intellectual functioning (AR 278).  He noted that Bell had many useful activity of daily living skills, managed himself in an apartment in the past and managed his welfare benefits (AR 278).     Dr. Neal reported that Bell performed at less than the first grade level in reading, spelling and arithmetic based upon his Wide Range Achievement Test-Revised (WRAT-R) scores and  was functionally illiterate (AR 278).  Dr. Neal opined that he was not competent to manage his own funds due to functional illiteracy (AR 278).  He felt Bell appeared mildly depressed and could benefit from antidepressant medication (AR 279).

Dr. Neal assessed Bell's ability engage in certain work-related activities (AR 285).  He found that Bell had no restrictions in his ability to understand and remember short, simple instructions; was slightly restricted in his ability to carry out short, simple instructions; was moderately restricted in his ability to understand, remember and carry out detailed instructions; and was markedly restricted in his ability to make judgments on simple work-related decisions (AR 285).  He further found Bell was slightly restricted in his ability to interact appropriately with the public, supervisors and co-workers, and only moderately limited in his ability to respond appropriately to work pressures and changes in a routine work setting (AR 285).

Bell returned to Community Health Net on September 15, 2003 and reportedly suffered from back pain on and off (AR 328).  He claimed he was unable to work due to the pain (AR

4

328). On physical examination, Namirah Jamshed, M.D., reported that Bell had good range of motion and a non-tender back (AR 328). Dr. Jamshed explained to Bell that he may not be eligible for disability due to the recommendation from physical therapy for work and the lack of x-ray findings (AR 328). She ordered an MRI for further evaluation (AR 328).

An MRI of Bell's lumbar spine conducted on September 25, 2003 revealed degenerative changes at the L5-S1 level with no significant intraspinal pathology detected (AR 305).

Bell returned to Dr. Jamshed on January 14, 2004 and reported that his back pain was better (AR 331). On physical examination, he exhibited decreased flexion secondary to pain, a positive straight leg raising test on the left and his extension was within normal limits (AR 331). Dr. Jamshed informed him of the negative MRI findings and recommended that he attend physical therapy again, follow exercise advice and take his pain medication as prescribed (AR 331).

Bell was seen by Dr. Jamshed on February 13, 2004 and complained that his medications were not working (AR 326). He reported that his back pain was exacerbated with walking (AR 326). Dr. Jamshed reported that Bell exhibited a normal gait, no loss of lordosis, no tenderness to palpation and no spasm (AR 326). He had a good range of motion, was able to walk on his heels and toes and his straight leg raising test was negative (AR 326). Dr. Jamshed assessed him with degenerative joint disease of the lumbar spine and prescribed Ultram and Lortab (AR 326). He was again referred to physical therapy and was referred to pain management (AR 326).

On March 15, 2003, Bell was seen by Dr. Jamshed who noted that after physical therapy Bell should have been able to control his symptoms independently but he had not been able to do so (AR 325). Dr. Jamshed reported that the Lortab, however, had controlled Bell's pain and a review of his systems were unremarkable for urinary or bowel incontinence, or any "red flags" for back pain (AR 325). She refilled his prescription for Lortab and referred him to pain management (AR 325).

On June 14, 2004, Dr. Jamshed noted that Bell was on disability, although his evaluation was unremarkable and his pain was well controlled on medication (AR 323). She refilled his Lortab prescription (AR 323).

When Bell returned to Dr. Jamshed on September 16, 2004, he reportedly was doing well

and was preparing to travel to Florida to see his sister who was ill (AR 322). While Dr. Jamshed noted that he seemed depressed he was otherwise doing "okay" (AR 322).

On October 18, 2004, Bell reported that he had fallen while in Florida for which he received sutures on his head (AR 321). He complained of left neck and shoulder pain due to the fall (AR 321). Other than shoulder pain, Bell had no other complaints (AR 321).

Bell complained of low back pain occurring off and on when seen by Dr. Jamshed on November 17, 2004, who noted that his pain had been well controlled (AR 320). Bell reported that he had taken extra pain medication to control his left axillary pain and had run out of pain medication (AR 320). Physical examination of the left axillary revealed a cystic in the left posterior which appeared to be healing (AR 320). Dr. Jamshed referred him to a general surgeon for removal of the cyst (AR 320).

Dr. Jamshed reported on December 17, 2004 that Bell was "doing well" and his pain medication kept him functional (AR 318). She refilled his Lortab and Elavil (AR 318).

On January 18, 2005 Dr. Jamshed reported Bell was doing well on pain medication (AR 317). In February 2005, Bell complained of right inguinal pain (AR 316). Dr. Jamshed diagnosed him with a right inguinal hernia and referred him to general surgery (AR 316). Bell was seen throughout 2005 by Dr. Jamshed for refills of his medications (AR 308-315).

Bell testified at the first hearing on December 5, 2005 that he lived in a shelter and had been homeless since 2001 (AR 348; 361). He attended school through the ninth grade in special education classes, did not read, wrote "a little," and was unable to do simple math (AR 348). Bell testified that he required assistance in filling out his disability forms, would seek assistance from others if he was unable to understand his mail, needed help making large change and would ask the bus driver for assistance while riding the bus (AR 362; 364). Bell claimed he was unable to work due to back pain and depression (AR 348-349). He took medication for his back pain and depression which caused drowsiness (AR 350-351). He was able to cook, make his bed at the shelter, watch television, listen to the radio and dress and bath himself (AR 352; 354). He indicated that he could lift approximately five to ten pounds, walk three blocks, stand for about thirty minutes and sit for about one hour and thirty minutes before needing to stand (AR 353-355).

At the second hearing held on March 9, 2006, Bell testified that he lived in an apartment (AR 375). He indicated that he did not finish the ninth grade in school (AR 376). He testified that he was unable to do simple math, but could identify the different denominations of money (AR 378). He claimed he was unable to work due to his bad back and inability to read (AR 379). He took Vicodin for his back pain and amitriptyline for sleep disturbances (AR 382-383). Medication relieved his back pain (AR 394). Bell testified that he was able to clean his apartment, make his bed, take out the trash and watch television with understanding, but did not cook since he went to the City Mission for meals (AR 385-386). He had trouble sleeping at night and napped every day for approximately one to one and a half hours (AR 390-391). He was able to stand for thirty minutes and sit for twenty to thirty minutes before needing to move around (AR 390).

Dr. Daniel Mackley, a medical expert, testified that Bell's physical impairments were lumbosacral sprain with degenerative joint disease and degenerative disc disease (AR 401). He further testified that he had a hernia repair and a history of injury from being struck by a vehicle (AR 402). Dr. Mackley opined that Bell's physical impairments did not meet or equal any listed impairments (AR 402).

Tania Shullo, a vocational expert, also testified at the second hearing. The ALJ asked the vocational expert if work existed for an individual of Bell's age, education, and work history, who was limited to medium work with limited pushing and pulling ability in his lower extremities, and was limited in his ability to deal with detailed instructions, complex decisions, frequent changes in the work setting and written instructions (AR 404). The vocational expert testified that such an individual could return to his past relevant work, and could also perform work as a kitchen helper, dining room attendant and window cleaner (AR 404-405). The vocational expert further testified however, that such individual would not be able to work if he were unable to keep a steady pace and needed more than regularly established rest periods (AR 405).

Following the hearing, the ALJ issued a written decision which found that Bell was not eligible for SSI under the Act (AR 16-25). Bell's request for review by the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 7-9). He

subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen,* 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ found that Bell's probable borderline intellectual functioning and chronic low back pain were severe impairments, but determined at step three that he did not meet a listing (AR 19-21). At step four, the ALJ determined that Bell retained the residual functional capacity to perform at least medium work not involving pushing and pulling with the

lower extremities, or following detailed instructions, making complex decisions, adapting to frequent changes in a work setting and reading written instructions (AR 21). The ALJ concluded that in addition to being able to perform his past relevant work as a laborer, there were other jobs cited by the vocational expert that Bell could perform (AR 23). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Here, Bell challenges the ALJ's finding at step three of the sequential evaluation process. Step three requires a determination of whether the claimant has an impairment or combination of impairments which meets or equals a listed impairment in Appendix 1. 20 C.F.R. § 404.1520(d). A claimant who meets or medically equals all of the criteria of an impairment listed in Appendix 1 is *per se* disabled and no further analysis is necessary. *Burnett v. Commissioner*, 220 F.3d 112, 119 (3rd Cir. 2000). A claimant bears the burden of proving that his impairments meet or equal a listed impairment. *See Adorno v. Shalala,* 40 F.3d 43, 46 (3rd Cir. 1994).

Bell contends that the ALJ erroneously found that he did not meet the listing for mental retardation as set forth at 12.05B and/or 12.05C, 20 C.F.R. Pt. 404, Subpt. P, App. 1, which provides:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> •   •   •
>
> B.  A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of functioning[.]
>
> •   •   •

20 C.F.R. Subpt. P, App. 1, §§ 12.05B and C.

Dr. Neal reported that Bell achieved a Verbal IQ score of 66, a Performance IQ score of 59, and a Full Scale IQ score of 61 (AR 278). However, "[f]or a claimant to show that his

impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990) (emphasis in original); *see also Williams v. Sullivan,* 970 F.2d 1178, 1186 (3rd Cir. 1992).

Essentially, Bell takes issue with two conclusions of the ALJ relative to his failure to meet the Listing for mental retardation.  First, he contends that Dr. Neal's opinion as to his IQ was both ambiguous and contradictory.  Second, he argues that the ALJ's conclusion that there was insufficient evidence to establish deficits in adaptive functioning during the developmental period is not supported by substantial evidence.  We find merit in both arguments.

In *Miller v. Barnhart,* 2005 U.S.Dist.Lexis 43702 (W.D.Pa. 2005), the ALJ rejected the claimant's IQ scores based upon the psychologist's statement that the validity of the results were "mildly questionable and an estimate of the true level of functioning would fall at least within the borderline range." *Id.* at *10.  The district court found fault with the ALJ's reliance on this portion of the psychologist's report since the psychologist did not state that the IQ results were invalid, but merely stated they were "mildly questionable." *Id.*  In rejecting the ALJ's reasoning, the district court stated:

> At best, Dr. Newman's narration is ambiguous, at worst, it is contradictory.  Because IQ tests are essential to a determination of listing level severity under § 12.05.C, it is imperative that the results be clear.  In light of the uncertainty surrounding the IQ results, at a minimum, the ALJ should have sought clarification from Dr. Newman.  If ambiguity remained, a second IQ test should have been administered.  Because the sole basis for rejecting the validity of the IQ results was the ambiguous narration of Dr. Newman, this case must be remanded for additional analysis as to whether plaintiff meets the (a) prong of Listing 12.05.C.

*Miller,* 2005 U.S.Dist.Lexis 43702 at *10-11.

Here, as in *Miller*, the ALJ's rejection of Bell's IQ is completely speculative.  Dr. Neal's opinion is internally inconsistent.  While he concludes, on the one hand, that the IQ test scores are valid, he then opines that the Full Scale IQ was "felt to be a mild underestimate of his true abilities" (AR 277-278).  To further muddy the already murky waters, he speculates that Bell "*possibly* functions at the upper end of mild mental retardation or even lower end of borderline intellectual functioning" (AR 278) (emphasis added).  Consistent with *Miller*, a remand is

appropriate for the ALJ to clarify his opinion in this regard.

With respect to the second issue (i.e., Bell's contention that the ALJ erred in finding insufficient evidence of onset of the impairment before age 22), Bell relies on *Markle v. Barnhart*, 324 F.3d182 (3rd Cir. 2003). In *Markle*, the court directed that the case be remanded to the ALJ because he had not addressed the onset date, and in so doing observed:

> Given *Williams*, it is clear that the record should contain some evidence that supports the finding that onset preceded age 22. Here there is evidence that is at least consistent with, and, depending on one's interpretation, could be said to support early onset. There is nothing in Dr. Williams's report to suggest that retardation originated after age 21. In school Markle took special education courses through ninth grade, dropping out after two months in the tenth grade. He "struggled" to obtain a GED in the 1970s. He has not held a job for at least fifteen years, and his work before that was limited to some painting and wallpapering of houses and cutting grass.

*Markle*, 324 F.3d at 189.

Here, Bell was also in special education classes in school. Like the claimant in *Markle*, he only matriculated to ninth grade. Dr. Neal reported long standing learning difficulties. On remand, the ALJ is also directed to revisit the issue of the onset of the impairment before age 22 in conjunction with his reexamination of Dr. Neal's opinion relative to IQ as discussed more fully above.

### IV. CONCLUSION

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROSEVELT BELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 06-161 Erie |
| ) | |
| MICHAEL ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

AND NOW, this 26th day of April, 2007, and for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No. 7] is DENIED and Defendant's Motion for Summary Judgment [Doc. No. 9] is DENIED. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is hereby directed to mark the case closed.

                                              s/ Sean J. McLaughlin
                                              United States District Judge

cm: All parties of record.